**The DOW CHEMICAL COMPANY,
Plaintiff,**

v.

**EXXON CORP. and Exxon Chemical
Patents, Inc., Defendants.**

**C.A. No. 96–584–SLR.**

United States District Court,
D. Delaware.

Dec. 14, 1998.

Richard K. Herrmann, of Blank, Rome, Comisky & McCauley L.L.P., Wilmington, DE, for plaintiff. Of counsel: Robert G. Krupka, P.C., Donald G. Kempf, Jr., P.C., Chaim T. Kiffel, Jeffrey D. Mills, Wendy L. Bloom, and Michael J. Munn, of Kirkland & Ellis, Chicago, IL. Charles J. Kalil, of The Dow Chemical Company, Midland, Michigan. L. Wayne White, of The Dow Chemical Company, Freeport, TX.

William J. Wade, and Frederick L. Cottrell, III, of Richards, Layton & Finger, Wilmington, DE, for defendants. Of counsel: Richard C. Levin, P.C., Scott R. Jacobs, Lisa S. Gallerano, Richard J. Smith, and John L. Hendricks, of Akin, Gump, Strauss, Hauer & Feld, L.L.P., Dallas, TX.

## OPINION

SUE L. ROBINSON, District Judge.

## I. INTRODUCTION

On December 2, 1996, plaintiff The Dow Chemical Company ("Dow") filed this action against defendants Exxon Corp. and Exxon Chemical Patents, Inc. ("ECPI") (collectively "Exxon"), alleging violations of the federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., and state law. (D.I.2) Specifically, Dow alleges that Exxon, through a pattern of mail and wire fraud, made fraudulent misrepresentations to the Patent and Trademark Office ("PTO") in order to dominate and control the market for polyethylenes made using single-site, metallocene catalysts, and thereby injured Dow. (D.I.2) The court has jurisdiction over plaintiff's RICO claims pursuant to 18 U.S.C. § 1964 and 28 U.S.C. § 1338 and supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

On March 29, 1997, defendants filed a motion to dismiss, or alternatively to stay, plaintiff's complaint on the grounds that the court lacks subject matter jurisdiction. (D.I.34) Defendants also moved to dismiss plaintiff's complaint for failure to state a claim on which relief may be granted. (D.I.34) The court heard oral argument on defendants' request on November 17, 1997. (D.I.67) For the reasons that follow, defendants' motion to dismiss shall be granted.[1]

## II. BACKGROUND

### A. The Technology

Both Dow[2] and Exxon[3] are involved in the manufacture and sale of polyethylene. Polyethylene is a widely used plastic, the worldwide market for which is enormous. To create polyethylene, a catalyst is combined with ethylene and an optional comonomer to form a polymerization reaction. There are four types of polymerization processes: gasphase, slurry, solution, and high pressure. Regardless of the type of polymerization process employed, the result is the formation of polyethylene pellets, which are sold to intermediate-level fabricators who use the pellets to produce plastic articles such as films, sheets, fibers, and blends. These intermediate-use products are then used to produce end-use products such as disposable diapers, car bumpers, and food storage bags.

Polyethylenes made using single-site catalysts exhibit particularly desirable traits and, as a result, are employed in a variety of end-use products. One such single-site catalyst is a metallocene catalyst. These catalysts have "as one component, a metallocene metal complex having one or more cyclopentadienyl groups (substituted or unsubstituted) at-

---

1. Also pending before the court are defendants' motion to strike the affidavits of Harry Manbeck, Jr. and Edwin Gambrell (D.I.53) and plaintiff's motion for a partial lifting of stay of discovery in order to perpetuate testimony (D.I.66). For purposes of preserving the record for appeal, plaintiff's motion for partial lifting of the stay of discovery (D.I.66) is granted. Defendants' motion to strike the affidavits (D.I.53) also is granted.

2. Dow is a Delaware corporation with headquarters in Midland, Michigan. (D.I.2, ¶ 2)

3. Defendant Exxon is a New Jersey corporation with headquarters in Irving, Texas. (D.I.2, ¶ 3) Defendant ECPI is a Delaware corporation with its principal place of business in Linden, New Jersey. (D.I.2, ¶ 4) ECPI is a wholly-owned subsidiary of Exxon and is the assignee of numerous patents and patent applications relating to polyethylene production using single-site catalyst technology. (D.I.2, ¶ 4)

tached to a transition metal atom, such as titanium or zirconium." (D.I. 2, ¶ 5 n. 1) Exxon began commercial production of polyethylenes using metallocene catalysts in 1991. It calls its single-site catalyst technology "EXXPOL Technology" and markets the polyethylene produced thereby under the tradename EXACT®. Dow, on the other hand, began commercial production of polyethylene using metallocene catalysts in 1993. It calls its technology "INSITE® Technology" and markets the polymers produced thereby both directly and through a joint venture with E.I. DuPont de Nemours (DuPont Dow Elastomers L.L.C.) under the tradenames AFFINITY®, ENGAGE®, ELITE®, and NORDELL®.

## B. The Complaint

In its complaint, Dow alleges that Exxon has set out to dominate the market with respect to polyethylenes produced using single-site catalysts. (D.I.2, ¶ 11) In particular, Dow contends that Exxon has targeted Dow's INSITE® Technology. (D.I.2, ¶ 11) In order to further its objective, Dow contends that Exxon has

> institut[ed] a deliberate strategic objective fraudulently to obtain and assert patents and technology rights in a manner calculated to (i) disrupt and take business of competitors, including Dow; (ii) take, destroy or devalue the intellectual property rights of competitors, including Dow; (iii) threaten competitors, including Dow, and their actual and potential customers; (iv) create confusion among Dow's customers about their freedom to use INSITE® Technology polymers; and (v) create a misperception that a license from Exxon is required to manufacture polyethylenes using any single-site catalyst, including Dow's.

(D.I.2, ¶ 12) According to Dow, "a defined group of experienced Exxon in-house attorneys and outside counsel (all of whom are specialists in patent law) engaged in fraudulent conduct before the PTO to acquire or assert patent rights." (D.I.2, ¶ 15)

Specifically, Dow details seven allegedly fraudulent schemes undertaken by Exxon with the express objective of "attain[ing] dominance and control over the polyethylene business, and especially the business for polyethylenes produced using single-site catalysts." (D.I.2, ¶ 15) The combination of these schemes, Dow contends, form a pattern of racketeering activity under 18 U.S.C. § 1961(1), (5). (D.I.2, ¶ 186) Dow alleges that Exxon has committed 41 predicate acts of mail fraud beginning in November 1988 and continuing through at least July 1996 in furtherance of its scheme to defraud:

> (i) by mailing to the PTO documents and papers containing fraudulent misrepresentations and fraudulent omissions of material fact designed to obtain issuance of patents; and (ii) by mailing to Dow and the PTO documents containing fraudulent misrepresentations designed to provoke and maintain interference proceedings against Dow and to prevent Dow from peacefully enjoying the valid patent rights it has obtained as a reward for its intensive research and development efforts.

(D.I.2, ¶¶ 191, 194)

### 1. Exxon's First Allegedly Fraudulent Scheme (Scheme 1)

Initially, Dow alleges that Exxon fraudulently procured U.S. Patent No. 5,405,922 ("the '922 patent"), covering a condensed mode gas-phase polymerization process for producing polyethylene using a metallocene catalyst. (D.I.4, Ex. 9) Specifically, Dow contends that Exxon attorney, "A",[4] knowingly misrepresented the prior art to the PTO examiner. In order to distinguish the '922 patent from the prior art, and thereby overcome the PTO's rejection of the pending claims, EA–A made the following assertion:

> Thus, it was surprising that a metallocene catalyst[ ], being soluble in hydrocarbon solvents, would polymerize olefins in a condensed mode process which utilizes a hydrocarbon solvent as a condensable inert. In a gas-phase operating in a noncondensed mode, should a hydrocarbon be

---

**4.** The court does not believe it is appropriate or necessary to specifically identify any of Exxon's attorneys. They will be referred to as "Exxon attorney 'A' or 'B'," abbreviated as "EA–A," or "EA–B," etc.

used, it is in a gaseous state and by definition, cannot solubilize a metallocene catalyst.

In essence, based upon the prior art disclosure, one of ordinary skill in the art would have expected that there was nothing to be gained but much to be lost in the use of a metallocene catalyst in a condensed mode process using as a condensable inert a material in which the metallocene is soluble. Thus, it is respectfully submitted that there is no[ ] motivation for using a metallocene catalyst in a condensed mode process.

(D.I.4, Ex. 13 at 5) Dow contends that EA–A knew at the time he made the statement to the PTO that the catalyst was not soluble, such knowledge coming "from express statements or teachings in Exxon's own prior patents and patent applications, including two Exxon patents EA–A had listed in the '922 patent specification itself—U.S. Patent Nos. 4,808,561 [ (D.I.4, Ex. 14) ] and 5,240,894 [ (D.I.4, Ex. 15) ]." [5] (D.I. 2 at 14) All of these references, or a counterpart thereof, were cited in the specification of the '922 patent application as describing "methods of supporting the catalyst of this invention." (D.I.4, Ex. 9, col.5, lns.25–37)

The examiner initially refused to accept EA–A's contentions that there was no motivation for using the metallocene catalyst in the prior art. (D.I.4, Ex. 21 at 8) However, after EA–A agreed to limit all of the independent claims in the application to a silica-supported metallocene catalyst, the examiner allowed all of the pending claims. In his Statement of Reasons for Allowance, the PTO examiner adopted EA–A's conclusion with regard to the prior art's characterization of metallocene catalysts:

> Thus, one of ordinary skill in the art would recognize [based upon the prior art [6]] that metallocene catalysts, whether or not they are supported, are soluble in a hydrocarbon solvent.... One skilled in the art would not have expected metallocene catalysts to remain on the support in an amount sufficient to produce a desired polymer.

(D.I. 4, Ex. 18 at 2) The examiner concluded that "applicants['] unexpected use [of] a supported metallocene catalyst," in combination with previously submitted amendments to the claims, rendered the claims allowable over the prior art. (D.I.4, Ex. 18 at 2–3) The '922 patent issued on April 11, 1995.

Dow contends that Exxon has used the '922 patent "in a manner that benefitted its competitive position to the detriment of its competitors, including Dow." (D.I.2 at 15) Specifically, Dow points to (1) Exxon's conversion of a polyethylene plant to employ the '922 technology (D.I.4, Ex. 5 at 7, Ex. 19) and (2) the Exxon–Union Carbide joint venture which, if it succeeds, according to Dow, will enable Exxon to dominate the production of polyethylenes using single-site catalysts by gas-phase process technology. (D.I.2, ¶ 29) Moreover, Dow contends that "the existence of the '922 patent [ ] has deterred and precluded competitors, including Dow, from developing similar gas-phase process technology, and from using this process to commercially produce polyethylene." (D.I.2, ¶ 30) Dow avers that Exxon's statement in a trade journal that the '922 patent was "an extremely broad and fundamental patent ... cover[ing] any metallocenes in any gas-phase operations in condensed mode" (D.I.4, Ex. 10; *see also* Ex. 11 at 4) indicated Exxon's intent to assert the 1922 patent against anyone who attempted to develop and use gas-phase process technology using a single-site catalyst. (D.I.2, ¶ 30) Consequently, Dow asserts, the '922 patent was a "substantial factor" in delaying Dow's efforts to consummate a business venture with BP Chemicals, Ltd. ("BP") for the production of polyethylenes using gas-phase process technology and single-site catalysts.

On May 21, 1996, BP filed a request for reexamination of the '922 patent with the PTO, asserting that the claims of the '922 patent are, *inter alia*, obvious over the prior

---

5. The other patent and the patent application Dow refers to are Exxon's U.S. Patent No. 4,937,301 (D.I.4, Ex. 16), issued June 26, 1990, and European Patent Application 0 336 593 (D.I.4, Ex. 17), published October 11, 1989.

6. The prior art discussed by the examiner does not include the Exxon patents and the European patent application cited by Dow.

art. (D.I.4, Ex. 21) In its request, BP contended that the sole basis for allowance of the '922 patent was the examiner's erroneous acceptance of EA–A's assertion regarding the solubility of the metallocene catalyst. (D.I. 4, Ex. 21 at 9–10) BP argued that, contrary to EA–A's assertion, one skilled in the art at the time of the invention would have known that "supported metallocene catalysts of the type used in the '922 patent would not undergo leaching of the metallocene catalyst from the support by the hydrocarbons used as the dew point increasing components in a condensed mode gas phase polymerization." (D.I. 4, Ex. 21 at 10)

The request for reexamination was granted on July 23, 1996. On October 17, 1996, the patent examiner rejected all of the claims of the '922 patent, stating that "one of ordinary skill in the art would not believe that the solubility of the silica supported metallocene catalysts would be a problem in a condensed mode fluidized bed polymerization process." (D.I. 4, Ex. 22 at 4) On December 27, 1996, Exxon filed a response in the reexamination disputing the examiner's findings. (D.I.36, Ex. 3)

On March 5, 1997, BP filed a second request for reexamination of the '922 patent, contending that Exxon's December 27, 1996 response sought to raise new bases for patentability of the '922 patent claims. (D.I.57, Ex. 23) Specifically, BP argued, *inter alia,* that Exxon's "new 'fouling' argument"[7] did not support patentability over the prior art because "one skilled in the art would not have expected a metallocene catalyst to be extracted from its support under condensing mode conditions." (D.I. 57, Ex. 23 at 14–18) This request for reexamination was granted on April 16, 1997, and it was consolidated with the first. (D.I.57, Ex. 24)

### 2. Exxon's Second Allegedly Fraudulent Scheme (Scheme 2)

The second allegedly fraudulent scheme involves Exxon's U.S. Patent No. 5,084,534 ("the '534 patent"), covering a process for the polymerization of ethylene at elevated temperature and pressures using an alumoxane/metallocene catalyst system in which the ratio of aluminum in the alumoxane to the transition metal in the metallocene is in the range of 1000:1 to 0.5:1. (D.I.4, Ex. 23) Dow contends that Exxon's attorney "B" made fraudulent representations to the PTO during prosecution of the '534 patent, and that these representations induced the PTO to issue the '534 patent. (D.I.2, ¶¶ 35–67)

On November 23, 1987, the patent examiner initially rejected claims 1–17 of the '534 patent application as, *inter alia,* obvious over the prior art. (D.I. 4, Ex. 24 at 3) Specifically, in this regard the patent examiner stated that

[i]t would be obvious to use the claimed aluminum to transition metal ratio because all the secondary references teach these ratios. . . . The productivities of the claimed process are not unexpected in view of the disclosure[s] of [the prior art].

(D.I. 4, Ex 24 at 3) In response to this rejection, EA–B represented to the PTO that the catalytic efficiency, measured in terms of catalytic productivity[8] and activity,[9] of

---

7. In its response Exxon argued that the obviousness rejection should be withdrawn because

[w]hether or not all the catalyst is extracted is not the issue here. In a continuous gas phase polymerization process operating in condensed mode, if even a small amount of the metallocene catalyst is removed from the silica support, fouling problems can result. . . .

In a continuous gas phase polymerization process operating in condensed mode, fouling problems leading to reactor shutdown would have been expected to result from the removal of even a small amount of the metallocene catalyst from the silica support. Knowing that the liquid in the recycle stream of a gas phase polymerization process operating in condensed mode contains not only monomer and comonomer, but also

condensable inert, one skilled in the art would have had concerns about using a soluble catalyst that could cause unwanted polymerization in the reactor system.

(D.I. 36, Ex. 3 at A113, A121)

8. Catalytic productivity is measured by comparing grams of polymer produced per gram of total catalyst. (D.I.2, ¶ 43(b))

9. Catalytic activity is measured by comparing grams of polymer produced per gram of the transition metal portion of the catalyst. (D.I.2, ¶ 43(a)) Since the transition metal is only one component of the total catalyst, the weight of the total catalyst is definitionally greater than the weight of the transition metal portion of the catalyst. (D.I.2, ¶ 43(b) n. 6)

the '534 patent process was "clearly unexpected and unpredictable" from the prior art. (D.I. 36, Ex. 5 at A187) EA–B characterized the prior art as demonstrating that there is an increase in productivity and activity of the catalyst with increasing aluminum-to-metallocene ratio. (D.I. 36, Ex. 5 at A187) Thus, EA–B asserted, it would not be obvious to one of ordinary skill in the art that "at high temperatures and pressures one would obtain significantly improved catalytic productivities with the low aluminum-to-metallocene ratios" taught in the '534 patent. (D.I. 36, Ex. 5 at A188)

On June 10, 1988, the patent examiner entered a final rejection of the claims on the ground that the claims were obvious in light of the prior art. (D.I. 4, Ex 27) EA–B requested reconsideration of the examiner's decision, arguing, *inter alia*, that

what applicant has shown in [the] instant application is that through the use of a very low aluminum to metallocene ratio, one obtains very high productivities in a high pressure, high temperature polymerization process .... [I]t is demonstrated that homogeneous systems having low aluminum to metallocene ratios obtain very poor catalyst productivity and in many instances show no polymerization activity.

(D.I.4, Ex. 110) The request was denied.

Subsequently, Exxon appealed the decision of the patent examiner to the PTO Board of Patent Appeals and Interferences ("the Board"). (D.I.4, Ex. 29) In the appeal, EA–B stated that the crux of Exxon's invention was the

process for the high temperature and high pressure polymerization of high molecular weight polyolefins which employs a metallocene-alumoxane catalyst characterized by **low molar ratios of aluminum: transition metal** (Al:M)

(D.I. 4, Ex. 29 at 7) (emphasis in original). In distinguishing the prior art, EA–B argued that the primary reference cited by the examiner exemplified a molar ratio of aluminum to metal of 2500:1, a ratio far in excess of that disclosed in the patent application. (D.I. 4, Ex. 29 at 9; D.I. 4, Ex. 113 at 2–8) In comparing the catalytic efficiency of the prior art with Exxon's invention, EA–B measured

the catalytic efficiency of the prior art based on catalytic activity, whereas he measured the catalytic efficiency of the 534 process in terms of catalytic productivity. (D.I.4, Ex. 29) Based upon his calculations, EA–B argued that

all of the secondary references demonstrate an increase in activity with an increase in aluminum:metal ratio and thus would not render Appellants' claimed invention of high productivity with low aluminum:metal molar ratio obvious.

(D.I. 4, Ex. 29 at 17) (emphasis added).

Dow contends that, based on his prior patent prosecution experience, EA–B knew that his representations to the PTO were fraudulent. Dow avers that EA–B knew the conversion number he used to calculate the aluminum to metal ratio in the primary reference was inaccurate and would inflate the ratio nearly three-fold. (D.I.2, ¶¶ 51–53). In addition, Dow contends that EA–B knew how to measure catalytic efficiency, and thus his "decision to measure catalyst efficiency in two different ways and then represent they were measured the same way was intentional and deliberate." (D.I.2, ¶ 45) According to Dow, "[h]ad [EA–B] used the same method to measure the catalyst efficiency of the 534 process and the prior art process, no difference in polymer production efficiency would have appeared. ... and the 534 patent would not have issued." (D.I.2, ¶ 46)

In April 1991, the Board reversed the examiner's rejection, noting that

the weight of t[he] evidence is such that we are constrained to agree with appellants' position that the evidence of the criticality of using lower ratios of aluminum to transition metal found in the working examples summarized in Table III of appellants' specification amounts to evidence of unobviousness sufficient to outweigh that evidence of obviousness.

(D.I. 4, Ex. 30 at 3) The Board adopted EA–B's characterization of the primary prior art reference stating that its "working examples ... all illustrate the use of very high aluminum to transition metal ratios." (D.I. 4, Ex. 30 at 3) The 534 patent issued on January 28, 1992.

Dow contends that the existence of the 534 patent has deterred Exxon's competitors, including Dow, from using single-site catalysts in combination with high temperature, high pressure process technology to produce polyethylenes. (D.I.2, ¶ 62) According to Dow, the only way competitors can safely (i.e., avoid a potential suit for infringement) employ such technology is by paying Exxon for a license, a cost Exxon need not incur. (D.I.2, ¶¶ 62–63) Thus, Dow contends, Exxon is in a position by virtue of the 534 patent to receive income whenever anyone uses the 534 patent technology and to achieve a greater profit margin from the sale of its polyethylene products. (D.I.2, ¶¶ 63)

On October 5, 1994, Dow filed a request for reexamination of the 534 patent, asserting that its claims are anticipated by and obvious over the prior art. (D.I.4, Ex. 31) In its request, Dow questioned Exxon's method of calculating catalytic activity, arguing that traditionally catalytic activity is measured in terms of the quantity of metallocene or transition metal in the catalyst, not total catalyst as Exxon employed. (D.I. 4, Ex. 31 at 13–16) According to Dow, recalculation of the 534 patent data using the traditional method of calculation reveals the same effect seen in the prior art—increasing activity with increasing aluminum to metal ratios. (D.I. 4, Ex. 31 at 15, 21–29) In addition, Dow asserted that recalculation of catalytic activity with changing aluminum to metal ratios on the basis of total catalyst in the prior art examples reveals that catalytic activity increases with decreasing aluminum to metal ratios, and thus, when properly compared to the results of the 534 patent, the effect claimed by Exxon is apparent in the prior art. (D.I. 4, Ex. 31 at 15, 21–29) Dow also alleged that

Exxon intentionally miscalculated the aluminum to metal ratio exemplified in the primary reference; according to Dow, the ratio, correctly calculated, falls within the range claimed by Exxon in the 534 patent. (D.I. 4, Ex. 31 at 17–21)

Dow's request for reexamination was granted in December 1994, and the examiner subsequently rejected all of the claims of the 534 patent, finding them either anticipated by the primary reference or obvious over the prior art. (D.I. 4, Ex. 32, Ex. 33 at 1–2) On August 8, 1995, Exxon filed a response in the reexamination disputing the examiner's findings. (D.I.4, Ex. 33) Exxon argued that the primary reference did not anticipate the 534 patent claims because the aluminum to metal ratio in the 534 patent is based on total aluminum in the alumoxane solution not on total aluminum resulting from the preparation of the alumoxane; consequently, the primary reference did not exhort the use of a catalyst with an aluminum to metal ratio within the range claimed by the 534 patent. (D.I.4, Ex. 33) Exxon also argued that the primary reference in combination with the secondary references did not teach that an aluminum to metal ratio of 1000:1 or less may be used in a high temperature, high pressure process to produce high molecular weight polymers.[10] (D.I. 4, Ex. 33 at 7–11) On October 18, 1995, the examiner rejected, for a second time, all of the claims of the 534 patent. (D.I. 4, Ex. 35 at 1) Exxon appealed the examiner's rejection to the Board on February 15, 1996.[11] (D.I.4, Ex. 35, Ex. 34)

### 3. Exxon's Third Allegedly Fraudulent Scheme (Scheme 3)

The third allegedly fraudulent scheme involves Exxon's U.S. Patent No. 5,322,728

**10.** During reexamination, Dow filed two protests under 37 C.F.R. § 1.291 in order "to correct factual allegations asserted by the patent owner in the subject reexamination which it knows or should know to be wrong." (D.I.4, Exs.38, 39) The PTO rejected both protests as being submitted in contravention of PTO procedures.

**11.** During reexamination, Exxon petitioned the PTO Commissioner requesting dismissal of the reexamination on the grounds that the examiner's rejection of the claims was based on a new interpretation of the claims and did not rely on any art or interpretation of prior art other than

that considered and rejected by the Board during the 534 patent prosecution. (D.I.4, Ex. 36) In response, the Commissioner returned the case to the examiner for further evaluation in light of the Federal Circuit's decision in *In re Recreative Technologies Corp.*, 83 F.3d 1394 (Fed.Cir.1996). The examiner responded by amending the grounds of his rejection on December 3, 1996. (D.I.36, Ex. 7) Given the new grounds for rejection, Exxon filed a Replacement Appeal Brief with the Board on February 5, 1997, replacing the brief filed on February 15, 1996. (D.I. 36, Ex. 4)

("the 728 patent"), covering fibers, and fabrics made from them, of ethylene copolymers. (D.I.4, Ex. 40) Dow contends that the attorneys authorized to prosecute the 728 patent, Exxon Attorneys "B," "C," and "D," deliberately failed to cite eight material prior Exxon patents and patent applications [12] in violation of their duty to disclose all known information that is material to patentability, 37 C.F.R. § 1.56. (D.I. 2, ¶ 72–74; D.I. 4, Ex. 49) Dow avers that each of these prior art references (1) describes the ethylene comonomer and starting materials described in the 728 patent; (2) describes the polymerization process and use of the metallocene catalyst set forth in the 728 patent; and (3) states that the polymer created by the polymerization process can be used to make, *inter alia,* fibers. (D.I. 2, ¶ 74; D.I. 4, Exs. 41–48) One or more of the Exxon attorneys responsible for prosecuting the 728 patent were also responsible for prosecuting the eight prior art references Dow contends were withheld from the PTO. (D.I.4, Exs.50–57) Thus, Dow alleges that either EA–B, –C, or –D, if not all of them, were aware of the material nature of the references. (D.I.2, ¶¶ 75–76) Dow avers that had these references been considered by the PTO, the 728 patent would not have issued. (D.I.2, ¶¶ 77–79) On June 20, 1995, Dow requested two interferences with the 728 patent. (D.I.57, Ex. 25)

Dow contends that Exxon has used the fraudulently obtained 728 patent to impede competitors from marketing polyethylenes made using single-site catalysts for fabric and fiber end-uses. (D.I.2, ¶ 80–82) According to Dow, it has delayed development of its own polyethylene products because of the risk that Exxon will attempt to block its efforts through infringement allegations. (D.I.2, ¶ 81) Dow contends that the only way competitors can safely market polyethylenes for fabric and fiber end-uses is by paying

Exxon for a license. (D.I.2, ¶ 81) Thus, Dow contends, Exxon is in a position to sell its polyethylenes to fabric and fiber manufacturers without charging a premium, something its competitors are unable to do. (D.I.2, ¶ 82)

### 4. Exxon's Fourth Allegedly Fraudulent Scheme (Scheme 4)

Exxon's fourth allegedly fraudulent scheme involves Patent Office Interference No. 103,404 ("the 404 interference") between Dow's U.S. Patent No. 5,272,236 ("the 236 patent") and Exxon U.S. Patent Application Serial No. 08/149,268 ("the 268 patent application").[13] The 236 patent covers a class of polyethylenes (ethylene/α-olefin copolymers) that contain long chain branching made using Dow's INSITE® technology. (D.I.4, Ex. 58) The polymers within this class have a high melt flow ratio ("$I_{10}/I_2$"), a relatively narrow molecular weight distribution ("$M_w/M_n$"), and a relatively broad critical shear stress at onset of gross melt fracture ("OGMF"). (D.I.4, Ex. 58) Included within the class are Dow's AFFINITY® and ENGAGE® polymer products, both of which are commercially successful for many end-use products. (D.I.4, Exs.59, 60) The 236 patent application was filed on October 15, 1991, and the patent issued to Dow on December 21, 1993. (D.I.4, Ex. 58)

On November 8, 1993, Exxon's attorney, "E," filed the 268 patent application. At the same time he requested that the examiner declare an interference between this application and Dow's 236 patent, arguing that the 268 patent application discloses and claims the same polymers and process to prepare those polymers as does the 236 patent. (D.I. 4, Ex. 61 at 5) According to EA–E, Example 47 of the 268 patent application possessed the properties claimed in the 236 patent, i.e., a melt flow rate $I_{10}/I_2=17.56$ and a molecular weight distribution $M_w/M_n=2.552$. (D.I. 4,

---

**12.** The Exxon patents and patent applications cited by Dow are as follows: U.S. Patent No. 5,264,405; U.S. Patent No. 5,168,111; U.S. Patent No. 5,096,867; U.S. Patent No. 5,055,438; U.S. Patent No. 5,026,798; U.S. Patent Application Serial No. 07/844,813; U.S. Patent Application Serial No. 07/728,428; and U.S. Patent Application Serial No. 07/406,945. (D.I.4, Exs.41–48)

**13.** The 268 patent application was a continuation of Patent Application Serial No. 07/844,813 ("the 813 patent application"), filed on March 2, 1992, which is a divisional of U.S. Patent Application Serial No. 07/581,841 ("the 841 patent application"), filed September 13, 1990, now U.S. Patent No. 5,096,867, issued March 17, 1992. (D.I.4, Ex. 61)

Ex. 61 at 5) EA–E conceded that the OGMF of Example 47 could not be measured by the method set forth in the 236 patent. (D.I. 4, Ex. 61 at 5) EA–E argued that since Example 47 first appeared in the 841 patent application it was entitled to an effective filing date of September 13, 1990. (D.I.4, Ex. 61 at 8)

Although Example 47 was included in the 813 patent application as well as the parent application, the 841 patent application (D.I. 4, Ex. 66 at 63), the properties of the polymer exemplified in Example 47, specifically the melt flow rate and molecular weight distribution, were not disclosed in either patent application. (D.I.4, Ex. 61 at 8) However, patent claims 15 and 16, which were added to the 268 patent application, did disclose these properties. Specifically, claim 15 covered a process for preparing the polymer exemplified in Example 47:

> A process of preparing on ethylene/1-octene copolymer having a melt flow ratio, $I_{10}/I_2 = 17.56$, and a molecular weight distribution, $M_w/M_n = 2.552 \ldots$

(D.I.4, Ex. 63 at 89) Claim 16 covered the polymer produced by the process set forth in claim 15. (D.I.4, Ex. 63) It was claims 15 and 16 that EA–E designated as corresponding to counts 1 and 2 of the interference, respectively. (D.I.4, Ex. 61 at 15)

Dow avers that this information was added in contravention of EA–E's certification, which accompanied the application, that the 268 application was a "true copy" of the prior 813 patent application. (D.I.2, ¶¶ 101–02; D.I.4, Ex. 64 at 4) Dow contends that EA–E intentionally created the "misimpression" that this information was included in the 813 and 841 patent applications although he knew that not to be the case. (D.I.2, ¶ 100) Dow also maintains that Exxon knew that the $I_{10}/I_2$ measurement for Example 47 was inflated because over time the $I_{10}/I_2$ value of an unstabilized polymer,[14] as was the three-year-old[15] portion of Example 47 that was tested, "increases dramatically."[16] (D.I.2, ¶ 105; D.I.4, Exs. 67, 68, 69)

Interference No. 103,404 ("the 404 interference") was declared on June 14, 1994. (D.I.4, Ex. 62) The 268 patent application was named the senior party and the 236 patent the junior party. (D.I.4, Ex. 62) The Administrative Patent Judge ("APJ") set forth two counts; claims 1–38 of the 236 patent and claims 15 and 16 of the 268 patent application were designated as corresponding to the counts. (D.I.4, Ex. 62) During the interference, Dow submitted a number of preliminary motions arguing, *inter alia*, that (1) "the melt flow ratio reported in Example 47 is not the melt flow ratio for the product produced when that example was performed" because the retained portion of Example 47 that was tested by Exxon was one which had aged at least three years unprotected by antioxidants (D.I.36, Ex. 9 at A231–34, A302–03, A331–32); and (2) Exxon should not be allowed the benefit of the 841 patent application filing date because it failed to establish that the parent application inherently discloses a polymer having characteristics within the limitations (i.e., the melt flow ratio, molecular weight distribution, and OGMF) claimed in the 236 patent, thus the matter added to the 268 patent application (i.e., claims 15 and 16) constitutes new matter.[17] (D.I.36, Ex. 10 at A355–60, A334–41; Ex. 11 at A451–56, A468–92) The APJ rejected

---

**14.** An unstabilized polymer is one in which no additive, such as an antioxidant, has been included so as to prevent chemical change over time. (D.I.2, ¶ 105)

**15.** Since Example 47 was included in the 841 patent application, ostensibly the sample was prepared prior to that application's September 13, 1990 filing date.

**16.** According to Dow, Exxon also knew that by subjecting the remainder of the retained sample of Example 47 to OGMF testing, it would ensure that there would be no portion of Example 47 left for Dow to sample. (D.I.2, ¶¶ 107–08) Dow contends that it has been unable to reproduce the polymer claimed in Example 47. (D.I.2, ¶ 109; D.I. 4, Exs. 72–75)

**17.** Dow also opposed, on the same grounds, Exxon's preliminary motion No. 8, which sought the benefit of an earlier filing date for claims that recited melt flow ratio limitations ostensibly inherently disclosed in other examples set forth in the parent applications that Exxon sought to add to the 268 patent application in order to redefine the interfering subject matter. (D.I.4, Ex. 77) Exxon's motion to add the claims was denied, and the motion for benefit was dismissed as moot. (D.I. 4, Ex. 79 at 31–32)

Dow's arguments, finding that Exxon's testing of the product of Example 47 was not flawed because the product tested "was not a freshly made one" and that Exxon was properly accorded the benefit of the prior applications because Example 47 was present in the 813 and 841 parent applications. (D.I.4, Ex. 79 at 13, 32–33) However, the APJ did agree with Dow that the 268 patent application did add matter not disclosed in the prior application and thus it was a continuation-in-part application rather than a continuation patent as Exxon contended. (D.I. 4, Ex. 79 at 13–14) The APJ required Exxon "to bring this matter to the attention of the primary examiner and to file an appropriate oath." (D.I.4, Ex. 79 at 14)

On December 5, 1995, judgment in the interference was entered against Dow on procedural grounds. (D.I.4, Ex. 80) Dow appealed the decision to this court on March 27, 1996. *See Dow Chem. Co. v. Exxon Chem. Patents, Inc.*, No. 96–190–SLR, 1998 WL 175883 (D.Del. Mar.24, 1998). This court vacated the interference judgment against Dow and remanded the case to the Board for further proceedings. *See id.*

Dow contends in its complaint that "Exxon has used and invested the proprietary rights it has fraudulently asserted to benefit its competitive position to the detriment of competitors, including Dow." (D.I.2, ¶ 119) According to Dow, as a result of Exxon's activities, it has lost business opportunities, experienced delays in implementing its IN-SITE' technology, and been forced to divert money that would have been spent developing further its INSITE® technology to refuting and exposing Exxon's fraudulently asserted proprietary rights. (D.I.2, ¶ 121)

### 5. Exxon's Fifth Allegedly Fraudulent Scheme (Scheme 5)

Exxon's fifth allegedly fraudulent scheme is, in essence, an expansion of its fourth allegedly fraudulent scheme. During the '404 interference, Dow filed an application to reissue the '236 patent, reissue application Serial No. 08/305,631 ("the '631 reissue application"). In response, on June 27, 1995, Exxon filed a protest under 37 C.F.R.

§ 1.291(a) against the '631 reissue application, arguing that the claims of the '631 reissue application should be rejected on the basis of the arguments made in the '404 interference and the APJ's determination in the interference that most of the claims of the '236 patent are unpatentable. (D.I.4, Ex. 82) On March 13, 1996, the examiner (1) allowed some of the claims of the '631 reissue application, (2) rejected some of the claims (indicating that they would be allowable if the mentioned § 112 rejections were overcome by appropriate amendment), and (3) provisionally rejected a number of claims based upon count 1 of the '404 interference. (D.I.4, Ex. 83) The examiner also suspended prosecution of the '631 reissue application pending determination of priority in the '404 interference. (D.I.4, Ex. 83 at 5)

On June 7, 1996, Exxon filed a second protest under 37 C.F.R. § 1.291(a) against the '631 reissue application. (D.I.4, Ex. 84) According to Exxon, this protest addressed new issues, such as the fact that judgment had been entered against Dow in the '404 interference, and therefore complied with PTO rules regarding new protests by earlier protestors. (D.I.4, Ex. 84 at 1–2) In the protest, Exxon argued, *inter alia*, that certain claims of the '631 reissue application were unpatentable as anticipated by or obvious over Example 7 of Exxon's U.S.Patent No. 5,055,438 ("the '438 patent"). (D.I.4, Ex. 84 at 31–33) Exxon contended that the properties of the copolymer of ethylene and butene–1 exemplified by Example 7 fell within the limitations claimed by the '631 reissue application. (D.I.4, Ex. 84 at 31–33) Specifically, Exxon averred that the $I_{10}/I_2$ and $M_w$ /$M_n$ of the copolymer were 9.4 and 3.42, respectively. (D.I.4, Ex. 84 at 31–33) The examiner recommended that Exxon's second protest be rejected, however a PTO Group Director, although he dismissed the petition as unnecessary, directed the examiner to consider the second protest. (D.I.4, Ex. 86)

On January 7, 1997, the reissue examiner indicated the allowance of certain claims of the '631 reissue application subject to the approval of the APJ in the '404 interfer-

ence.[18] (D.I.36, Ex. 12) The examiner continued the rejection of other claims. (D.I.36, Ex. 12) With regard to Exxon's second protest, the examiner stated:

> [T]he [ ] declaration indicat[ing] that the polymer of Example 7 of the '438 patent contains long chain branching based on activation energy is erroneous and without merit. As such, the polymer of Example 7 is not inherent property of the instant claimed polymer because inherency requires getting the properties at all times.

(D.I.36, Ex. 12)

Dow contends that Exxon has fraudulently asserted rights in Dow's '631 reissue application in order "to improve its competitive position to the detriment of Dow and Dow's customers." (D.I.2, ¶ 130) According to Dow, by filing these allegedly unauthorized protests and by allegedly misrepresenting the properties of the retained samples, Exxon has delayed the reissue of Dow's 236 patent and "has perpetuated the perceived cloud of uncertainty over Dow's INSITE® Technology polymer products and whether customers can be assured of their right to use Dow's INSITE® Technology polymer products free from potential claims by Exxon." (D.I.2, ¶ 131) Thus, Dow asserts Exxon has caused competitive harm to Dow. (D.I.2, ¶ 132)

### 6. Exxon's Sixth Allegedly Fraudulent Scheme (Scheme 6)

Exxon's sixth allegedly fraudulent scheme involves Dow's U.S.Patent No. 5,278,272 ("the '272 patent") filed on September 2, 1992, covering a class of polymers having "very good processability" as well as lower processing indices and a higher critical shear rate at the onset of surface melt fracture ("OSMF"). (D.I.4, Ex. 87) Included within this class of compounds are polyethylenes made by Dow's INSITE® Technology. On July 6, 1995, EA–E filed a request for an interference between the '272 patent and an Exxon continuation patent filed from Exxon's '813 patent application ("the B010D4 patent application").[19] (D.I.4, Ex. 88) Previously, Exxon had requested that the '272 patent be added to the '404 interference, but this request was denied. (D.I.4, Ex. 88 at 2) In the request for an interference, EA–E averred that "properties explicitly and inherently disclosed" in Example 7 of the B010D4 patent application include a $M_w/M_n = 3.42$ and an $I_{10}/I_2 = 9.4$—the same properties claimed in the '272 patent. (D.I.4, Ex. 88 at 13, 21) EA–E contended that neither the critical shear rate at OSMF nor the processing index properties claimed in the '272 patent added

> a new or distinctive limitation to the claims of the '272 patent over the first $I_{10}/I_2$ limitation. Rather, both of the properties in the third limitation are merely a restatement of the $I_{10}/I_2$ limitation, which is already specified expressly in all the independent claims.

(D.I.4, Ex. 88 at 6) EA–E also argued that the B010D4 patent application was entitled to the benefit of the September 5, 1989 filing date of Exxon's '945 patent application in which Example 7 first appeared.[20]

In September 1996, the APJ declared interference No. 103,797 ("the '797 interference") between the '272 patent and the B010D4 patent application. (D.I.4, Ex. 89) The B010D4 patent application was named the senior party and the '272 patent the junior party. (D.I.4, Ex. 89) The APJ set forth one count, to which claims 1–37 of the '272 patent and claims 15 and 16 of the B010D4 patent application were designated as corresponding. (D.I.4, Ex. 89)

Dow argues that Exxon knowingly misrepresented that the $I_{10}/I_2$ measurement of the

---

**18.** Dow subsequently transferred these claims to another pending patent application.

**19.** At the time Exxon requested the interference, Exxon's patent application had not yet been assigned an application serial number.

**20.** Exxon contended that the B010D4 patent application is a continuation of U.S. patent application Serial No. 07/844,813, filed March 2, 1992, which is a divisional of U.S. patent application Serial No. 07/581,841, filed September 13, 1990 (now U.S.Patent No. 5,096,867, issued March 17, 1992), which is a continuation-in-part of U.S. patent application Serial No. 07/533,245, filed June 4, 1990 (now U.S.Patent No. 15,055,438, issued October 8, 1991), which is a continuation-in-part of U.S. patent application Serial No. 07/406,945 ("the '945 patent application"), filed September 13, 1989, now abandoned. (D.I. 4, Ex. 88 at 17–18)

unstabilized product of Example 7 accurately reflected the properties exhibited by the polymer when it was produced. (D.I.2, ¶¶ 143–44) According to Dow, Exxon was well aware that the properties of the 4–year-old [21] retained sample of Example 7 would have "drastically changed" over time. (D.I.2, ¶¶ 143–44) Dow puts forth as evidence of Exxon's alleged misrepresentation the fact that Exxon initially indicated that Example 7 had been destroyed during testing, but that, after Dow filed a preliminary motion requesting the APJ to draw adverse inferences because no sample remained, Exxon discovered portions of Example 7 for Dow to test.

In its complaint, Dow contends that Exxon's fraudulent assertion of rights in Dow's '272 patent has "perpetuate[d a] cloud of uncertainty over Dow's INSITE® Technology polymer products." (D.I.2, ¶ 149)

### 7. Exxon's Seventh Allegedly Fraudulent Scheme (Scheme 7)

Finally, Dow contends that Exxon fraudulently attempted to obtain a patent covering single-site catalysts, by intentionally concealing the best mode of practicing the invention contained therein. This seventh allegedly fraudulent scheme involves Exxon's U.S.Patent Application Serial No. 07/542,236 ("the '236 patent application") and Dow's U.S.Patent Nos. 5,064,802 ("the '802 patent") and 5,132,380 ("the '380 patent").[22] Exxon's '236 patent application, filed June 22, 1993, covers single-site catalyst systems for use in "the production of polyolefins, particularly polyethylene, polypropylene, and ethylene-$\alpha$-olefin compounds." (D.I.4, Ex. 92 at 8) The catalyst systems claimed by the '236 patent application are comprised of a transition metal component ("the A component") and an ion-exchange reagent. (D.I.4, Ex. 92 at 10–11) The A component has a chemical formula of $CPMX_{n+1}$, where CP is a cyclopentadienyl ring, M is a metal, and $X_{n+1}$ refers to other constituents further defined in the patent claims. (D.I.4, Ex. 92 at 11–12)

Dow contends that the only cyclopentadienyl ring employed by Dr. Canich, one of the inventors of the '236 patent application, in her reductions to practice of the A component of the catalyst was tetramethyl-CP ("tm-CP") and, thus, it constitutes the best mode of practicing the invention. (D.I.2, ¶ 160; D.I.4, Exs. 93–94) Exxon initially had difficulty synthesizing the tm-CP compound and ultimately relied on a preparation used by Dr. Bercaw, an outside Exxon consultant.[23] (D.I.4, Exs.95–100) The Bercaw preparation is a "particularly sensitive preparation" with "the sensitive step [being] the drop-wise addition of sulfuric acid." (D.I.4, Ex. 99 at 15–17; see also Ex. 99 at 120) In a May 10, 1989 memorandum to EA–B containing "updated information" regarding the then draft '236 patent application, Dr. Canich stated with respect to catalyst preparation that "$LiHC_5Me_4$ [the tm-CP] was prepared as described by J.E. Bercaw in a private communication." (D.I.4, Ex. 101) The '268 patent application was submitted to the PTO without reference to Dr. Bercaw's method of preparing tm-Cp.[24] (D.I.4, Ex. 92)

In January 1991 all of the claims of the '236 patent application were rejected, inter alia, as being indefinite under 35 U.S.C. § 112. (D.I.4, Ex. 92 at 53–55) On April 8, 1991, Exxon filed a response to the examiner's rejection, amending the specification and claims in accordance with the examiner's suggestions. (D.I.4, Ex. 92 at 63–75) On May 24, 1991, the Examiner found all of the amended claims allowable but suspended ex parte prosecution of the application until November 28, 1991 due to a potential interference. (D.I.4, Ex. 92 at 80–81)

---

21. Since Example 7 was included in the '945 patent application, ostensibly the polymer was prepared prior to that application's September 13, 1989 filing date.

22. Dow makes the same contentions with respect to Exxon's U.S.Patent Application Serial No. 07/406,945 ("the '945 application"). However, Dow has failed to provide the court with a copy of the '945 patent application.

23. The ligand preparation supplied by Dr. Bercaw's group was copied from a Ph.D. thesis. (D.I.4, Ex. 99)

24. A Supplemental Information Disclosure Statement filed with the PTO on August 5, 1992 requested that the PTO consider and print on any patent two references authored by Dr. Bercaw, copies of which were attached to the statement. (D.I. 4, Ex. 92 at 103–05)

On February 3, 1992, the claims were rejected under 35 U.S.C. § 102(e) as being anticipated by Dow's '802 patent. (D.I.4, Ex. 92 at 90–91) In response, Exxon, *inter alia,* requested an interference between the '236 patent application and Dow's '802 and '380 as well as its U.S.Patent No. 5,066,741 ("the '741 patent"). In addition, Exxon amended the specification of the '236 patent application to claim priority under prior U.S. patent applications and contended that, as a result, it should be named the senior party with respect to any interference declared.[25] (D.I.4, Ex. 92 at 137–38) In February 1993, the APJ declared interference No. 103,112 between the '802 patent and the '236 patent application ("the '112 interference"); interference No. 103,113 between the '380 patent and the '236 patent application ("the '113 interference"); and interference No. 103,114 between Dow's '741 and '380 patents and the '236 patent application ("the '114 interference"). (D.I.4, Ex. 102) In each interference, Exxon was designated the senior party. (D.I.4, Ex. 102)

During the preliminary motion period in the '112 interference, Dow requested that Exxon not be accorded the benefit of the prior application with respect to the three counts at issue. (D.I.4, Ex. 103) Dow contended that none of the benefit applications contained a written description of an embodiment within the scope of any of the counts. (D.I.4, Ex. 103 at 15–22) Specifically Dow argued that

the Canich parent applications describe monocyclopentadienyl transition metal components, **but not the second component,** while the Turner and Hlatky parent applications describe the second components, **but not in conjunction with monocyclopentadienyl first components**.... In short, the complexes of the Canich "parents" and the Turner et al. "parents" describe the complexes of the counts only in the sense that hydrogen cyanide and sodium hydroxide together describe water (hydrogen hydroxide). That is, the first component part (hydrogen) can be found in hydrogen cyanide, and the second component part (hydroxy) can be found in sodium hydroxide but that coincidence does not amount to a description of HOH.

(D.I.4, Ex. 103 at 19–20) (emphasis in original). In its opposition to Dow's request, Exxon argued that it was entitled to the benefit of the earlier filing date because all of the elements of the catalyst system claimed by the '236 patent application were disclosed in the six parent applications. (D.I.4, Ex. 105) In March 1996, the APJ granted Dow's request, finding that "there [was] no enabling written description of an embodiment within the counts in any of the parent applications." (D.I.4, Ex. 104)

On October 2, 1996, Dow filed Contingent Motion No. 22 in the '112 interference, asserting that all of the '268 patent application claims corresponding to the count of the interference were unpatentable for inequitable conduct.[26] (D.I.36, Ex. 15) Specifically, Dow contended that the applicants and their representatives made "highly" material misrepresentations and submitted false statements and false expert testimony regarding their entitlement to the benefit of the earlier filing date. (D.I.36, Ex. 15) Dow argued that the misrepresentations were made with the intent to deceive the examiner regarding Exxon's entitlement to the benefit of the earlier filing date. (D.I.36, Ex. 15) On November 12, 1996, Exxon filed its opposition, refuting Dow's arguments. (D.I.36, Ex. 15) Dow filed its reply on December 17, 1996. (D.I.36, Ex. 15)

On November 12, 1996, Dow filed motion no. 26 in the '112 interference, arguing that

---

**25.** Specifically, Exxon contended that it should be accorded the benefit of U.S.Patent Application Serial No. 07/533,245, filed June 4, 1990 (now U.S.Patent No. 5,055,438, issued October 8, 1991), which is a continuation-in-part of U.S.Patent Application Serial No. 07/406,945, filed September 13, 1989, now abandoned, as well as U.S.Patent Application Serial No. 07/133,480, filed December 22, 1987, which is a continuation-in-part of U.S.Patent Application Serial No.

07/008, 800, filed January 30, 1987, now abandoned, and U.S. Patent Application Serial No. 07/133,052, filed December 21, 1987, which is a continuation-in-part of U.S.Patent Application Serial No. 07/011,471, filed January 30, 1987, now abandoned. (D.I.4, Ex. 92 at 137–38)

**26.** Dow filed the same motion in the '113 interference. (D.I.4, Ex. 106)

all of the '236 patent application claims involved in the interference were invalid for failure to disclose the best mode. (D.I.36, Ex. 14) Dow contended, *inter alia*, that despite the fact that every reduction to practice performed by the applicants used the tm-CP component, the patent does not disclose Dr. Bercaw's preferred method for making tm-CP even though it was the only method successfully employed by the candidates. (D.I.36, Ex. 14) Instead, Dow avers, the '236 patent application refers to two references which teach methods that the applicants were unable to employ successfully. (D.I.36, Ex. 14) On December 2, 1996, Exxon filed its opposition to Dow's motion, challenging Dow's contentions. (D.I.36, Ex. 14) Dow filed its reply on December 17, 1996. (D.I.36, Ex. 14)

In its complaint at bar, Dow asserts that Exxon's attorneys intentionally omitted from the '236 patent application any reference to Dr. Bercaw's preparation, instead submitting the patent application

> to the PTO with only a disclosure of methods that teach that tetramethyl-Cp is to be formed by following the procedures outlined in the Kohler et al. and Fendrick et al. publications—methods the inventors themselves could not successfully use to form the tetramethyl-Cp component.

(D.I.2, ¶ 168) Dow also alleges that Exxon fraudulently represented to the PTO that it was entitled to the benefit of earlier filing dates so that it could be designated the senior party in the interferences and thereby prevent Dow from discovering Exxon's intentional concealment of the best mode.[27] (D.I.2, ¶¶ 174–82) Dow contends that Exxon's

> fraudulent assertion of patent rights in Dow's numerous single-site catalyst inventions has allowed Exxon to continue its efforts to develop and use these catalysts to make and sell polyethylenes without the risk that Dow might assert its '380 or '802 patents, or require Exxon to take a license.

(D.I.2, ¶ 183) According to Dow, Exxon's fraudulent assertions with respect to its proprietary rights in Dow's technology have resulted in lost or delayed licensing opportunities as well as the "inability to deliver patent protection" for its single-site catalyst technology. (D.I.2, ¶ 184) Dow avers that it

> faces the risk that, should Exxon somehow succeed in asserting that it first invented Dow's novel single-site catalysts, Exxon would assert these rights to block Dow from using numerous single-site catalysts that were independently developed at Dow through intensive research and development efforts, unless Dow pays Exxon.

(D.I. 2, ¶ 184)

## IV. DISCUSSION

Exxon has moved for dismissal of Dow's complaint pursuant to Fed.R.Civ.P. 12(b)(1), or alternatively to stay the action pending the conclusion of the proceedings currently before the PTO or on appeal. (D.I.34) Exxon also has moved for dismissal of Dow's complaint pursuant to Fed.R.Civ.P. 12(b)(6). (D.I.34) Since jurisdiction must be decided before the court can decide Exxon's Rule 12(b)(6) motion, *see Bell v. Hood*, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946), the court shall address the Rule 12(b)(1) motion first.

### A. Subject Matter Jurisdiction

#### 1. Standard of Review under Fed.R.Civ.P. 12(b)(1)

Not only may the lack of subject matter jurisdiction be raised at any time, it cannot be waived and the court is obliged to address the issue on its own motion. *See Moodie v. Federal Reserve Bank of New York*, 58 F.3d 879, 882 (2d Cir.1995). Once jurisdiction is challenged, the party asserting subject matter jurisdiction has the burden of proving its existence. *See Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 507 (2d Cir.1994). Under Rule 12(b)(1), the court's jurisdiction may be challenged either facially (the legal sufficiency of the claim) or factually (sufficiency of jurisdictional fact). *See* 2 James W. Moore, *Moore's Federal Practice* § 12.30[4] (3d ed.1997) (hereinafter

---

**27.** Under PTO rules, the junior party to an interference must prove its case and discovery is first taken in its entirety by the senior party.

*Moore's Federal Practice* ). Under a facial challenge to jurisdiction, the court must accept as true the allegations contained in the complaint. *See id.* § 12.30[4]. Dismissal for a facial challenge to jurisdiction is "proper only when the claim 'clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or . . . is wholly insubstantial and frivolous.' " *Kehr Packages, Inc. v. Fidelcor, Inc.,* 926 F.2d 1406, 1408–1409 (3d Cir.1991) (quoting *Bell v. Hood,* 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946)); *see Oneida Indian Nation v. County of Oneida, New York,* 414 U.S. 661, 666, 94 S.Ct. 772, 39 L.Ed.2d 73 (1974); *Kulick v. Pocono Downs Racing Ass'n,* 816 F.2d 895, 897–899 (3d Cir.1987).

 Under a factual attack, however, the court is not "confine[d] to allegations in the [ ] complaint, but [can] consider affidavits, depositions, and testimony to resolve factual issues bearing on jurisdiction." *Gotha v. United States,* 115 F.3d 176, 179 (3d Cir.1997); *see Mortensen v. First Fed. Sav. & Loan Ass'n,* 549 F.2d 884, 891–892 (3d Cir.1977); *see also Moore's Federal Practice* § 12.30[3]. Although the court should determine subject matter jurisdiction at the outset of a case, "the truth of jurisdictional allegations need not always be determined with finality at the threshold of litigation." *Moore's Federal Practice* § 12.30[1]. Rather, a party may first establish jurisdiction "by means of a nonfrivolous assertion of jurisdictional elements and any litigation of a contested subject-matter jurisdictional fact issue occurs in comparatively summary procedure before a judge alone (as distinct from litigation of the same fact issue as an element of the cause of action, if the claim survives the jurisdictional objection)." *Jerome B. Grubart, Inc. v. Great Lakes Dredge & Dock Co.,* 513 U.S. 527, 537–38, 115 S.Ct. 1043, 130 L.Ed.2d 1024 (1995) (internal citations omitted).

### 2. Ripeness

In the instant action, Exxon contends that Dow's claims are not ripe for adjudication because the pending PTO proceedings might significantly affect, if not resolve, the issues at bar. The Supreme Court has explained the policies underlying the ripeness doctrine in *Abbott Laboratories v. Gardner,* 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967):

> [I]ts basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.

*Id.* at 148–49, 87 S.Ct. 1507. The Court set forth a two-prong standard by which to evaluate the ripeness of a claim: (1) "the fitness of the issues for judicial decision"; and (2) "the hardship to the parties of withholding court consideration." *Id.* at 149, 87 S.Ct. 1507. Both prongs must be satisfied before a court can exercise its jurisdiction.[28]

 Issues are fit for adjudication if there exists a present case or controversy between the parties. Thus, "courts will not decide a case where the claim involves 'contingent future events that may not occur as anticipated, or indeed may not occur at all.' " *Binker v. Pennsylvania,* 977 F.2d 738, 753 (3d Cir.1992) (quoting 13A Charles A. Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3532 at 112 (1984)).

Dow's complaint alleges an overarching scheme in violation of RICO, involving a pattern of fraudulent misrepresentations to the PTO. This alleged pattern of racketeering, according to Dow, has caused injury to Dow that the outcome of the PTO proceedings will not obviate. Although in certain contexts allegations of fraud may be heard by the PTO, the PTO lacks jurisdiction to hear Dow's RICO claims. Nor does the PTO have the authority to award Dow the extraordinary remedy of treble damages and attorneys' fees which it seeks. Furthermore, Dow's RICO claims are premised upon

---

**28.** Exxon does not contest that Dow has established the second prong of this analysis, hardship.

fraudulent misrepresentations, the standard for which are within the traditional competence of the district courts. Thus, referral of the misrepresentation issues to the PTO is not justified "by the interest in promoting uniformity and accuracy of decisionmaking with an agency's area of expertise." *Shaw v. Rolex Watch U.S.A., Inc.*, 776 F.Supp. 128, 132 (S.D.N.Y.1991). The court recognizes that the issues before the PTO involve issues of fact that underlie Dow's contentions before this court; nevertheless, the PTO's findings would not be *res judicata* in this case.

■■■ The court concludes, therefore, that the ultimate resolution of the underlying PTO proceedings will not eliminate the justification for litigation under RICO. The cases cited by Exxon are inapposite. In those cases the existence of a case or controversy was dependent on the resolution of pending judicial or administrative proceedings. *See Cedars–Sinai Med. Ctr. v. Watkins*, 11 F.3d 1573, 1581–83 (Fed.Cir.1993) (dismissing plaintiff's complaint seeking to set aside a Department of Energy "Determination" asserting title to the subject matter of plaintiff's patent application because, were the PTO to conclude that a party other than plaintiff "should prevail in the Interference, any decision by the federal courts regarding the efficacy of the Determination would have absolutely no effect with regard to [plaintiff's] patent rights"); *Lincoln House, Inc. v. Dupre*, 903 F.2d 845 (1st Cir.1990) (affirming dismissal of RICO claims because the only injury alleged by plaintiff was the inability to satisfy a prospective state court judgment against defendant); *Country Mut. Ins. Co. v. American Farm Bureau Fed'n*, 876 F.2d 599 (7th Cir.1989) (finding that a trademark registration had not yet been "procured" within the meaning of the Lanham Act where the registration application was pending before the Trademark Office and thus claim that prosecution of the application for registration was fraud on the office was not yet ripe for

adjudication); *Terra Nova Ins. Co. v. DiStefano*, 663 F.Supp. 809 (D.R.I.1987) (staying RICO claim where plaintiff's ability to demonstrate it was injured as a result of scheme to defraud insurers was contingent upon its prevailing in a pending state court proceeding addressing the right to recover under the insurance policy and defendants' bad faith); *Miller v. Lucas*, 51 Cal.App.3d 774, 124 Cal.Rptr. 500, 191 U.S.P.Q. 166 (Cal. Ct.App.1975) (dismissing plaintiff's state tort claims because the PTO interference proceeding was still pending, where the only act alleged was that defendant filed applications in the PTO that "conflicted" with plaintiff's patent).[29] Here, Dow's claims are not contingent upon the outcome of issues which the PTO might consider. Regardless of the outcome of the PTO proceedings, the legal prerequisites to sustaining Dow's cause of action under RICO would not necessarily be eliminated. *See Minnesota Mining & Mfg. Co. v. Norton Co.*, 929 F.2d 670 (Fed.Cir.1991). Therefore, this is not a case where the action before the court "may not occur at all."

The court finds that Dow has established both the fitness of the issues for adjudication and hardship. Since both prongs of the analysis have been satisfied, the court concludes that Dow's RICO claims are ripe for judicial decision.

### 3. Noerr–Pennington Doctrine

■■■ Exxon also argues that because Dow's RICO claims are based solely upon Exxon's petitioning activity before the PTO, resolution of these proceedings may immunize Exxon from liability under the Noerr–Pennington doctrine. The Noerr–Pennington doctrine emanated from the Supreme Court's decision in *Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *accord United Mine Workers of America v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). In *Noerr*, the Court

**29.** Exxon also cites to *Deltec, Inc. v. Laster*, 326 F.2d 443 (6th Cir.1964), in which the Sixth Circuit affirmed the judgment of the district court dismissing as prematurely filed an antitrust claim based upon fraud on the PTO on the ground that the PTO had exclusive jurisdiction to hear and determine the priority of the patent

applications. However, the exclusivity of the PTO's jurisdiction regarding the enforcement of a patent obtained by fraud was rejected by the Supreme Court in *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965).

held that antitrust violations may not be predicated upon the defendant's attempts to influence the passage or enforcement of laws. *See Noerr,* 365 U.S. at 135, 81 S.Ct. 523. This principle, which is premised upon the First Amendment's right to petition the government, has been expanded to include access to courts and administrative agencies. *See California Motor Transp. Co. v. Trucking Unlimited,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). Although the Noerr–Pennington doctrine was first recognized in the context of antitrust litigation, it has been extended beyond that context. *See, e.g., Bill Johnson's Restaurants, Inc. v. NLRB,* 461 U.S. 731, 103 S.Ct. 2161, 76 L.Ed.2d 277 (1983) (extending the Noerr–Pennington doctrine to bar the NLRB's attempt to enjoin prosecution of a suit as an unfair labor practice); *Whelan v. Abell,* 827 F.Supp. 801, 803 (D.D.C.1993), *rev'd on other grounds,* 48 F.3d 1247 (D.C.Cir.1995) ("[I]f a person has a protected right to bring an objectively-based antitrust claim against a competitor, the same protection must be afforded to others who bring other such objectively-based claims and allegations before a government agency or court."). In general, therefore, the Noerr–Pennington doctrine "protects those who attempt to use the power of government organs, including the judiciary, to further private ends." *FilmTec Corp. v. Hydranautics,* 67 F.3d 931, 937 (Fed.Cir.1995).

The Noerr–Pennington doctrine, however, does not protect "sham" litigation. *See Noerr,* 365 U.S. at 144, 81 S.Ct. 523. If an action "ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor [then] the application of the Sherman Act would be justified." *Id.* The Supreme Court recently clarified this "sham" exception in *Profession-*

*al Real Estate Investors, Inc. v. Columbia Pictures Indus.,* 508 U.S. 49, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (hereinafter *PRE* ). The Court set forth a two-part definition of sham litigation:

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr,* and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals "an attempt to interfere directly with the business relationships of a competitor" through the "use [of] the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon."

*Id.* at 60, 113 S.Ct. 1920 (citations omitted).

In a recent case, *Nobelpharma AB v. Implant Innovations, Inc.,* 141 F.3d 1059 (Fed. Cir.1998), the Federal Circuit addressed whether the Noerr–Pennington doctrine is vitiated by fraud on the PTO, specifically the effect of *PRE* on *Walker Process*[30] and its progeny.[31] The Federal Circuit determined that *PRE* 's two-part test for a sham is applicable to an antitrust claim based on the assertion of a patent procured by knowing and willful fraud. *See id.* at 1071 ("*PRE* and *Walker Process* provide alternative legal grounds on which a patentee may be stripped of its immunity from the antitrust laws; both legal theories may be applied to the same conduct."). Relying on the Supreme Court's decision in *PRE,* the Federal Circuit concluded that

---

**30.** In *Walker Process,* the Supreme Court held that proof that a patentee obtained its patent by knowing and willful misrepresentation of facts to the PTO "would be sufficient to strip [the patentee] of its exemption from the antitrust laws." *Walker Process,* 382 U.S. at 177, 86 S.Ct. 347. The court also held that "enforcement of a patent procured by fraud on the Patent Office may be violative" of the Sherman Act. *Id.* at 174, 86 S.Ct. 347.

**31.** The Federal Circuit held that "whether conduct in procuring or enforcing a patent is sufficient to strip a patentee of its immunity from the antitrust laws is to be decided as a question of Federal Circuit law." *Nobelpharma AB,* 141 F.3d at 1068. In the absence of Third Circuit precedent addressing this issue, the court will look to Federal Circuit case law.

under *PRE*, a sham suit must be both subjectively brought in bad faith and based on a theory of either infringement or validity that is objectively baseless. Accordingly, if a suit is not objectively baseless, an antitrust defendant's subjective motivation is immaterial.

*Id.* at 1072.

■ The court concludes that it cannot properly determine from the pleadings whether or not Exxon's petitioning activity in the various PTO proceedings at issue is objectively baseless. See *Hydranautics v. Filmtec Corp.*, 70 F.3d 533, 537–39 (9th Cir. 1995). Dow asserts facts that, if true, would prove that Exxon engaged in a pattern of fraudulent conduct before the PTO in order to procure or assert patent rights. Exxon denies that such fraud occurred. Without further evidence, the court declines to opine as to Exxon's immunity from suit under the Noerr–Pennington doctrine. *Cf. FilmTec Corp.*, 67 F.3d at 938 (finding that where there is no dispute as to the facts, the question as to whether or not a suit was objectively baseless is a question of law).

### 4. Collateral Attack on Administrative Proceedings

Finally, Exxon argues that Dow's claims are precluded as a matter of law by the prohibition on collateral attacks on PTO decisions. Schemes 1, 2, 3, and 5 involve allegations of fraudulent conduct occurring as part of patent prosecution, reexamination, or reissue proceedings. Because these proceedings are conducted *ex parte* between the applicant and the PTO, Dow has been precluded from raising allegations of fraud before the PTO. Therefore, the allegations asserted in Schemes 1, 2, 3,[32] and 5 cannot be characterized as collateral attacks on the PTO.

By contrast, schemes 4, 6, and 7 involve interference proceedings, *inter partes* contests during which the PTO is able to review allegations of fraud. With respect to scheme 7, Dow did assert during the PTO interference proceeding that Exxon committed fraud on the PTO. (D.I.2, ¶ 183; D.I.4, Ex. 106) Likewise, with respect to scheme 6, Dow indicated in its complaint that it "intend[ed] to raise Exxon's fraudulent conduct in that interference at the appropriate time." (D.I.2, ¶ 150) Thus, the PTO will have the opportunity to review Dow's allegations of fraud raised in these alleged schemes.

■ The fact that the PTO may review the underlying bases of Dow's fraud allegations does not necessarily preclude this court's review of these allegations in the context of Dow's RICO claims. Like state law unfair competition claims and federal antitrust claims, civil RICO has been considered an appropriate tool for addressing an alleged pattern of fraud on the PTO, provided the other elements necessary to establish a RICO case are present. *See, e.g., B.V. Optische Industrie de Oude Delft v. Hologic, Inc.*, 909 F.Supp. 162, 168–171 (S.D.N.Y. 1995); *Heden v. Hill*, 937 F.Supp. 1230, 1241–1245 (S.D.Texas 1996); *Hoffman v. Wisner Classic Mfg. Co.*, 927 F.Supp. 67, 74 (E.D.N.Y.1996); *Purolite Int'l Ltd. v. Rohm & Haas Co.*, 24 U.S.P.Q.2d 1857 (E.D.Pa. 1992); *Rohm & Haas Co. v. Brotech Corp.*, 770 F.Supp. 928 (D.Del.1991). Therefore, the court shall deny Exxon's 12(b)(1) motion.

### B. Dow's RICO Claims

### 1. Standard of Review Under Fed. R.Civ.P. 12(b)(6)

■ Exxon has moved for dismissal pursuant to Fed.R.Civ.P. 12(b)(6). In ruling on a 12(b)(6) motion, the factual allegations of the complaint must be accepted as true.

**32.** Exxon contends that Dow is without standing to sue on the basis of alleged scheme 3 because Exxon has never asserted this patent against Dow and, thus, no "case or controversy" exists. In support of its contention, Exxon cites to *Cygnus Therapeutics Sys. v. ALZA Corp.*, 92 F.3d 1153 (Fed.Cir.1996). In *Cygnus*, the Federal Circuit found plaintiff's *Walker Process* antitrust claim not actionable in the absence of efforts by the patentee to enforce its patent in any uncom-
petitive manner because controlling circuit precedent required " 'some effort at enforcement' " of the patent serving as the foundation of the antitrust claim. A cause of action brought under RICO, however, does not require the injured party to demonstrate that the patentee attempted to enforce its patent in an anticompetitive manner. Moreover, *Cygnus* was expressly overruled by the Federal Circuit's decision in *Nobelpharma AB*, see discussion *supra* n. 31.

*See Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972) *(per curiam )* Moreover, the court must accept as true all allegations contained in the complaint and is bound to give the plaintiff the benefit of every reasonable inference to be drawn from those allegations. *See Retail Clerks Int'l Ass'n v. Schermerhorn,* 373 U.S. 746, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963); *Schrob v. Catterson,* 948 F.2d 1402, 1405 (3d Cir.1991). Accordingly, the court must resolve any ambiguities concerning the sufficiency of the claims in favor of the plaintiff. *See Hughes v. Rowe,* 449 U.S. 5, 10, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980) *(per curiam ).* Thus, the "court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984).

### 2. RICO Standing

Initially, Exxon alleges that Dow does not have standing to assert its RICO claims because it seeks relief based only on an indirect injury. Dow's RICO claims arise from allegedly fraudulent statements made by Exxon and its agents to the PTO in violation of the federal mail and wire fraud statutes. Exxon argues that the PTO is the direct victim of such alleged conduct and that Dow has been injured, if at all, only indirectly by the PTO's declaration of interferences or issuance of patents. Dow contends that Exxon specifically intended to disrupt Dow's business activities and that its injuries are the direct result of the PTO's reliance on Exxon's allegedly fraudulent statements.

In 1970, Congress enacted RICO as Title IX of the Organized Crime Control Act, Pub.L. 91–452, 84 Stat. 922, primarily "to address the infiltration of legitimate business by organized crime." *United States v. Turkette,* 452 U.S. 576, 591, 101 S.Ct. 2524, 69 L.Ed.2d 246 (1981); *see* 18 U.S.C. § 1961 *et seq.* The wording of RICO, however, does not expressly indicate that Congress intended an organized crime restriction.[33] *See H.J.*

---

**33.** By contrast Title VI explicitly refers to "organized criminal activity." See 18 U.S.C.

---

*Inc. v. Northwestern Bell Tele. Co.,* 492 U.S. 229, 244–49, 109 S.Ct. 2893, 106 L.Ed.2d 195 (1989). As a result, RICO has been applied to an expansive array of situations, "evolving into something quite different from the original conception of its enactors." *Sedima v. Imrex, Co.,* 473 U.S. 479, 500, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). Recognizing RICO's use against nonorganized crime defendants, the Supreme Court remarked that

> this defect—if defect it is—is inherent in the statute as written, and its correction must lie with Congress. It is not for the judiciary to eliminate the private action in situations where Congress has provided it simply because plaintiffs are not taking advantage of its more difficult applications.

*Id.* at 499–500, 105 S.Ct. 3275; *accord H.J. Inc.,* 492 U.S. at 249, 109 S.Ct. 2893. As the Court noted in *H.J. Inc.,* 492 U.S. at 246, 109 S.Ct. 2893,

> the legislative history shows that Congress knew what it was doing when it adopted commodious language capable of extending beyond organized crime.

Accordingly, despite acknowledging that "[o]rganized crime was without a doubt Congress' major target," the Supreme Court consistently has refused to narrow the construction of RICO's expansive terms to impose an organized crime limitation. *Id.; see, e.g., Reves v. Ernst & Young,* 507 U.S. 170, 113 S.Ct. 1163, 122 L.Ed.2d 525 (1993), *National Org. for Women, Inc. v. Scheidler,* 510 U.S. 249, 114 S.Ct. 798, 127 L.Ed.2d 99 (1994); *Sedima, S.P.R.L. v. Imrex Co.,* 473 U.S. 479, 496, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985); *Turkette,* 452 U.S. 576, 101 S.Ct. 2524, 69 L.Ed.2d 246.

▬▬▬ The section of RICO allowing private civil suits such as the instant action provides that

> [a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter may sue therefor in any appropriate United States district court and shall recover threefold the dam-

---

§ 3503(a).

ages he sustains and the cost of the suit, including a reasonable attorney's fee.

18 U.S.C. § 1964(c) (1997). In order to have standing under RICO, a plaintiff must meet the injury and causation requirements set forth in § 1964(c). *See Sedima*, 473 U.S. at 496, 105 S.Ct. 3275. The Third Circuit noted in *McCarthy v. Recordex Serv., Inc.*, 80 F.3d 842 (3d Cir.1996), that "antitrust standing principles apply equally to allegations of RICO violations." *Id.* at 855 (citing *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 270, 112 S.Ct. 1311, 117 L.Ed.2d 532 (1992)). Thus, in determining whether Dow has standing to sue in the instant action, the court must employ the analytical framework set forth by the Supreme Court in *Associated General Contractors, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (hereinafter *AGC*). This framework encompasses the following considerations: (1) the causal connection between the RICO violation and the harm to the plaintiff; (2) the directness or indirectness of the asserted injury; (3) the existence of more direct victims of the alleged violation; and (4) the potential for duplicative recovery or complex apportionment of damages.[34] *See McCarthy*, 80 F.3d at 850 (citing *AGC*, 459 U.S. at 537–44, 103 S.Ct. 897).

■■■ Factors one and two require Dow to demonstrate that the alleged violation was not only the "but for" cause of plaintiff's injury but also the proximate cause. *See Holmes*, 503 U.S. at 267–68, 112 S.Ct. 1311. In describing the proximate cause requirement, the *Holmes* Court noted the need "for some direct relation between the injury asserted and the injurious conduct alleged." *Id.* at 268, 112 S.Ct. 1311 (citing *AGC*, 459 U.S. at 532–33, 103 S.Ct. 897). The Court went on to state that such a requirement precluded from recovery "a plaintiff who complained of harm flowing merely from the misfortunes visited upon a third person by

the defendant's acts." *Id.; see also McCarthy*, 80 F.3d at 855 (holding that, because plaintiffs were only indirect victims not direct purchasers, they lacked standing to pursue both their antitrust and RICO claims).

Here, the scheme, as set forth by Dow, posits a chain of causation comprised of the following steps. First, Exxon made allegedly fraudulent misrepresentations before the PTO in order to obtain patent rights. Second, the PTO granted Exxon a variety of patents concerning polyethylene production, particularly that involving single-site catalysts. In addition, the PTO commenced a number of reissue, reexamination, and interference proceedings involving both Exxon's and Dow's technology rights. Third, Exxon asserted its patent property rights in a manner designed to improve its competitive position in the polyethylene market at the expense of its competitors such as Dow. As a result, Dow alleges that Exxon has harmed Dow through lost sales and lost opportunities to license its INSITE® Technology.

Although the alleged predicate acts may be the but-for cause of Dow's injuries, Dow's ability to trace its injuries to the those acts traverses "several somewhat vaguely defined links." *AGC*, 459 U.S. at 540, 103 S.Ct. 897. Dow's losses do not stem directly from Exxon's alleged misrepresentations to the PTO. Rather, Dow's losses result from the intervening acts of the PTO as well as Dow's customers and business affiliates. The PTO has discretion whether or not to grant patent property rights and declare interferences and it is only those intervening decisions that connect Exxon's allegedly fraudulent misrepresentations to the losses suffered by Dow. *See Eli Lilly & Co. v. Roussel Corp.*, 23 F.Supp.2d 460, 484–85 (D.N.J.1998); *Barr Labs. Inc. v. Quantum Pharmics, Inc.*, 827 F.Supp. 111, 116 (E.D.N.Y.1993). Moreover, Dow's customers and business affiliates can choose whether or not to pursue business opportunities with Dow and/or purchase or

---

**34.** "[S]ince 'antitrust injury' has no analogue in the RICO setting," *Holmes*, 503 U.S. at 269 n. 15, 112 S.Ct. 1311 (citing *Sedima*, 473 U.S. at 495–97, 105 S.Ct. 3275), the court need not consider the fifth *AGC* factor, i.e., that the "nature" of the injury alleged be "of the type that the [ ] statute was intended to forestall." *See Sedima*,

473 U.S. at 495, 105 S.Ct. 3275 ("Given that 'racketeering activity' consists of no more and no less than commission of a predicate act, § 1961(1), we are initially doubtful about a requirement of a 'racketeering injury' separate from the harm from the predicate acts. A reading of the statue belies any such requirement.").

license Dow's INSITE® Technology. *See Eli Lilly & Co.*, 23 F.Supp.2d at 484; *Barr Labs., Inc.*, 827 F.Supp. at 116. Thus, the harm alleged by Dow is contingent upon discretionary acts on the part of its own customers and business affiliates as well as the PTO. Consequently, the injuries allegedly suffered by Dow are too remote to justify RICO standing.

Turning to the third factor, in the framework set forth by Dow, the PTO is the player through which Exxon has gained commercial advantage, in the form of patent and technology property rights.[35] As such, the PTO stands as the defrauded party, not Dow. Exxon's allegedly fraudulent misrepresentations deprived the PTO of valuable property interests in the unissued patents. *See United States v. Martinez*, 905 F.2d 709, 715 (3d Cir.1990) (holding that the state's interest in an unissued license is "property" within the meaning of the mail fraud statute). Thus, the PTO was the direct victim of the alleged racketeering as it was the party who suffered the first (i.e., most direct) economic loss as a result of the allegedly fraudulent conduct.

Dow's alleged injuries are only remotely linked to the alleged predicate acts, being contingent not only on the harm suffered by the PTO but also a number of other intervening forces. Although the PTO's alleged reliance on Exxon's supposed misrepresentations may have resulted in the issuance of a number of patents to Exxon, the mere grant of a patent is not harmful *per se*. The harm occurs only if the patent rights are asserted by the holder, in this case Exxon. Thus, under the framework as alleged by Dow, in the absence of commercial activities, Dow is not at all injured by the predicate acts. Any injuries alleged by Dow are derivative, if not independent, of the harm suffered by the PTO and are more attributable to intervening causes than to the predicate acts themselves. *See Holmes*, 503 U.S. at 271, 112 S.Ct. 1311 (finding that the nonpurchasers' injuries were connected to the conspirators' acts only through the intervening insolvency

of the broker-dealers); *Rehkop v. Berwick Healthcare Corp.*, 95 F.3d 285, 287–89 (3d Cir.1996) (holding that the plaintiff, who was fired for refusing to submit fraudulent Medicare, Medicaid, and Medical Assistance forms, lacked standing to sue under RICO because the direct victims of the alleged racketeering were the Medicare and Medicaid programs and the taxpayers); *cf. Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.*, 140 F.3d 494 (3d Cir.1998) (finding that where plaintiff's "TPA relationship with [the pharmacy] was a direct target of the alleged scheme" plaintiff had standing to pursue its civil RICO claim). Dow, as a more remote victim than the PTO, is not the proper party to assert a claim under RICO.[36]

The fourth factor of the *AGC* analysis concerns the potential for duplicative recovery or complex apportionment of damages. Allowing Dow to proceed in this action would expose Exxon to multiple recoveries in RICO actions brought by other competitors who sustained indirect injuries. The sheer variety and number of potential plaintiffs would render the calculation of possible respective recoveries incredibly complex, requiring the trier of fact to ascertain "the amount of a plaintiff's damages attributable to the violation, as distinct from other, independent, factors." *Holmes*, 503 U.S. at 269, 112 S.Ct. 1311 (citing *AGC*, 459 U.S. at 542–43, 103 S.Ct. 897). Moreover, the court would be forced "to adopt complicated rules apportioning damages among plaintiffs removed at different levels of injury from the violative acts, to obviate the risk of multiple recoveries." *Id.* (citing *AGC*, 459 U.S. at 543–44, 103 S.Ct. 897) In sum, allowing Dow to proceed with its indirect claim "would open the door to 'massive and complex damages litigation[, which would] not only burde[n] the courts, but [would] also undermin[e] the effectiveness of treble-damages suits.'" *Id.* at 274, 112 S.Ct. 1311 (quoting *AGC*, 459 U.S. at 545, 103 S.Ct. 897) (alterations in original).

**35.** Although a public entity may serve as the RICO enterprise, in the case at bar Dow does not allege that the PTO is the "enterprise."

**36.** The fact that the direct victim, the PTO, may not be able to assert a RICO claim against Exxon

does not justify allowing an indirect victim, such as Dow, to bring suit. *See Barr Labs., Inc.*, 827 F.Supp. at 116 n. 5.

■ Based on its analysis of the factors set forth by the Supreme Court in *AGC*, the court concludes that Dow lacks standing to assert a claim under RICO. Accordingly, Exxon's motion to dismiss Dow's RICO claim is granted.

### 3. Substantive claims

Exxon contends that even if Dow has sufficiently alleged facts to confer standing, Dow's RICO claims still fail as a matter of law. Specifically, Exxon argues that (1) with regard to its § 1962(a) and (b) claims, Dow has failed to allege an injury distinct from that purportedly caused by Exxon's predicate acts; (2) Dow has failed to plead an enterprise separate and distinct from Exxon for purposes of § 1962(c); and (3) Dow's § 1962(d) claim does not adequately allege a conspiracy. Notwithstanding its conclusion that Dow lacks standing to assert its civil RICO claims, the court will address Exxon's arguments *seriatim*.

### a. Section § 1962(a) Claim

■ Exxon contends that Dow's § 1962(a) claim should be dismissed "because Dow has failed to plead sufficiently that Exxon ... used or invested the proceeds from the alleged pattern of frauds in an enterprise which proximately injured Dow." (D.I. 35 at 33) Section 1962(a) provides in relevant part:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the

activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(a). This section is "primarily directed at halting the investment of racketeering proceeds into legitimate businesses, including the practice of money laundering." *Brittingham*, 943 F.2d at 303 (citing 116 Cong. Rec. 35,199 (1970)). Under § 1962(a), in order to withstand a motion to dismiss, a plaintiff must allege (1) that the defendant has received money from a pattern of racketeering activity; (2) that the defendant invested that money in an enterprise; and (3) that the enterprise affected interstate commerce. *See Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1188 (3d Cir.1993). Furthermore, the Third Circuit has held that in pleading a § 1962(a) claim, the plaintiff must allege an injury resulting from the use or investment of racketeering income that is distinct from the injury caused by the underlying predicate acts themselves. *See id.*; *Glessner v. Kenny*, 952 F.2d 702, 708 (3d Cir.1991); *Rose v. Bartle*, 871 F.2d 331, 357 (3d Cir.1989). The Third Circuit also has stated that " § 1962(a) requires the plaintiff to demonstrate that the use or investment of racketeering income was a 'substantial factor' in causing the injury." *Brittingham*, 943 F.2d at 304.

In the case at bar, Dow contends that it has alleged sufficiently the "investment injury" required under § 1962(a). Dow asserts that Exxon, through its Law Technology unit, has committed racketeering frauds in order to procure patent rights. (D.I.2, ¶¶ 188–96) These patent rights and associated licensing revenue (which constitute the proceeds of the racketeering activities), Dow alleges, have been used, directly or indirectly, to acquire, establish and operate the Established Polyethylene Polymer Business and Exxpol enterprises, which are distinct business entities from Exxon's Law Technology unit.[37] (D.I.2, ¶¶ 199–204) Both of these

---

**37.** According to Dow, the Exxpol enterprise, which is an association-in-fact comprised of Exxon, ECPI, Exxon Research and Engineering Company, various Exxon agents and employees involved in Exxon Chemical Company's EXXPOL® business unit, is engaged in the manufacture and sale of polyethylenes made using metallocene catalysts, including Exxon's EXACT® polymers. (D.I.2, ¶ 199) In contrast, the Estab-

lished Polyethylene Polymer Business enterprise, which is an association-in-fact comprised of Exxon, ECPI, Exxon Research and Engineering Company and other Exxon agents, employees, officers and directors, is engaged in the manufacture and sale of polyethylene polymers that are not made using single-site catalysts but are made using other methods. (D.I.2, ¶ 200)

enterprises, Dow contends, are engaged in activities which affect interstate or foreign commerce. (D.I.2, ¶¶ 199–200) Dow avers that Exxon's use and investment of its racketeering funds into the Exxpol and the Established Polyethylene Polymer Business enterprises is not a normal reinvestment of corporate profits and "is a substantial factor in the injury to Dow." (D.I.2, ¶ 206) Dow contends that it has been injured by Exxon's use or investment of the proceeds through lost sales, lost opportunities to license its INSITE® Technology, and delays in implementing its INSITE® Technology and finalizing and commercializing joint ventures with E.I. DuPont de Nemours & Co. and BP Chemicals, Ltd. (D.I.2, ¶ 205)

■■■ Dow's allegations are analogous to those asserted by the plaintiff in *Lightning Lube.* In *Lightning Lube,* the plaintiff argued that the theft of its trade secrets by defendant constituted racketeering income and that the investment of that income to build a competing business hurt plaintiff's sales. *See Lightning Lube,* 4 F.3d at 1188. Analyzing plaintiff's allegations, The Third Circuit concluded that

> [i]n essence, then, [plaintiff] contends that the use of "income"—i.e., the trade secrets—stolen from [plaintiff] through fraud permitted [defendant] to establish its "enterprise." However, we have recognized repeatedly that this type of allegation—that the use and investment of racketeering income keeps the defendant alive so that it may continue to injure plaintiff—is insufficient to meet the injury requirement of section 1962(a). In such situations, we have held that the fact that a plaintiff claims that the injury allegedly perpetrated on it would not have occurred without the investment of funds from the initial racketeering activity does not change the fact the plaintiff's alleged injury stems from the pattern of racketeering, and not from the investment of funds by the defendant.

*Id.* at 1188; *see also Brittingham,* 943 at 304–05 ("Over the long term, corporations generally reinvest their profits regardless of the source. Consequently, almost every racketeering act by a corporation will have

some connections to the previous act."). Based upon this reasoning, the court concludes that Dow's allegations do not state a cognizable claim under § 1962(a) since the injury described stems from the alleged pattern of racketeering itself.

### b. Section 1962(b) Claim

■■■ Exxon argues that Dow's § 1962(b) claim should be dismissed "because Dow has failed to plead sufficiently that Exxon ... acquired or maintained control of an enterprise through the alleged pattern of frauds which proximately injured Dow." (D.I.35 at 33–34) Section 1962(b) provides that it is unlawful

> for any person through a pattern of racketeering activity or through collection of an unlawful debt to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

18 U.S.C. § 1962(b). To state a claim under this section, a plaintiff must establish that (1) the interest or control of the RICO enterprise by the defendant is a result of racketeering; and (2) injury from the defendant's acquisition or control of an interest in a RICO enterprise is distinct from the alleged injury resulting from the underlying predicate acts. *See Lightning Lube,* 4 F.3d at 1190. The Third Circuit has opined that "[i]t is not enough for the plaintiff merely to show that a person engaged in racketeering has an otherwise legitimate interest in an enterprise. Rather, it must be established firmly that there is a nexus between the interest and the alleged racketeering activities." *Id.; accord Kehr Packages, Inc.,* 926 F.2d at 1411. Typically, under § 1962(b) the enterprise is the victim of the racketeering activity. *See Scheidler,* 510 U.S. at 259, 114 S.Ct. 798.

Dow contends that its § 1962(b) injury is distinct from the underlying racketeering activities. In its complaint, Dow alleges that Exxon has

> acquired an interest in, and ha[s] maintained control of, the New Exxpol Business

and Exxon–UCC enterprises [ [38]] [through the pattern of [alleged] racketeering activity] . . .

 a. [Exxon] acquired its control of, and interest in, the Exxon–UCC enterprise as a direct result of its pattern of racketeering activities, including its fraudulent scheme involving the fraudulently obtained '922 patent.

 b. The advent of Dow's INSITE® Technology and INSITE® Technology polymers threatened the collapse of [Exxon's] New Exxpol Business. As a direct result of [Exxon's] pattern of racketeering activity, [Exxon was] able first to establish, then to improve the competitive position of and finally to re-establish control over the New Exxpol Business enterprise, to the detriment of competitors, including Dow.

(D.I.2, ¶ 214) As a result of Exxon's control over the New Exxpol Business and the Exxon–UCC enterprises, Dow contends it has been harmed through lost sales, lost opportunities to license its INSITE® Technology, and delays in implementing its INSITE® Technology and finalizing and commercializing joint ventures with E.I. DuPont de Nemours & Co. and BP Chemicals, Ltd. (D.I.2, ¶¶ 216–17) Dow also alleges injury from the reinvestment of the racketeering proceeds into the Established Polyethylene Polymer Business and Exxpol enterprises. (D.I.2, ¶ 219)

 Dow's claim under § 1962(b) fails for the same reason as did its § 1962(a) claim. Dow's allegations indicate that it is attempting to seek recovery under § 1962(b) for injuries allegedly resulting from the predicate racketeering acts of fraud, i.e., alleged misrepresentations before the PTO culminating in the grant of proprietary rights in various polyethylene technologies. Although Dow has alleged that Exxon's acquisition and control of the various enterprises has allowed Exxon to cause further competitive harm to Dow, this does not change the fact that Dow's purported injuries stem from the underlying racketeering acts themselves, i.e, the acquisition and assertion of patent property rights. Such injuries cannot form the basis of a § 1962(b) claim. Rather, § 1962(c) is meant to remedy these injuries. Accordingly, the court will dismiss Dow's § 1962(b) claim.

### c. Section 1962(c) Claim

Exxon asserts that Dow has failed to establish a cause of action under § 1962(c) because the only enterprises identified are the Exxpol enterprise and the Extended Exxpol enterprise,[39] which Exxon asserts are not separate and distinct from Exxon and ECPI.[40] Section 1962(c) reads in pertinent part:

---

**38.** Dow avers that the New Exxpol Business is an association-in-fact comprised of Exxon, ECPI, Exxon Research and Engineering Company, certain Exxon attorneys (including EA–A, EA–B, EA–C, EA–D and EA–E), along with various other Exxon agents and employees involved in Exxon Chemical Company's EXXPOL® business unit, the purpose of which is the establishment and development of "a new business venture devoted to the production and sale of polyethylenes produced using single-site catalysts, such as metallocenes, including the manufacture and sale of EXACT® polymers." (D.I.2, ¶ 211) According to Dow, the Exxon–UCC enterprise is a "joint venture initiated between Exxon Corp. and Union Carbide Corp. to exploit gas-phase polyethylene polymerization process technology." (D.I.2, ¶ 212)

**39.** The Extended Exxpol Enterprise is an association-in-fact comprised of Exxon, ECPI, Exxon Research and Engineering Company, Exxon, certain Exxon attorneys (including EA–A, EA–B, EA–C, EA–D, and EA–E), various other Exxon agents and employees involved in Exxon Chemical Company's EXXPOL® business unit, as well as Exxon's customers and technology licensees. (D.I.2, ¶ 224)

**40.** Dow alleges that Exxon, through a pattern of racketeering, has conducted and participated, directly or indirectly, in the affairs on these enterprises by

 (1) participating and directing the fraudulent obtaining and asserting of patent property rights;
 (2) using the fraudulently obtained and asserted rights to improve its competitive position with respect to polyethylenes produced using single-site catalysts;
 (3) *inter alia,* actively inducing customers to make "unnecessary" purchases of its polyethylenes and to take "unnecessary" licenses to its technology; and by
 (4) imposing licensing restrictions on those in the enterprise that exploit the fraudulently obtained licenses.

It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

18 U.S.C. § 1962(c). Title 18 defines "person" to include "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). "Enterprise" is defined to include "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *Id.* § 1961(4).

■ For purposes of § 1962(c) claims, the defendant "persons" (here Exxon and ECPI) must be separate and distinct from the named enterprise (here the Exxpol and Extended Exxpol enterprises). *See Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.,* 46 F.3d 258, 268 (3d Cir.1995). In *Jaguar Cars,* the Third Circuit stated that

alleging conduct by officers or employees who operate or manage a corporate enterprise satisfies this requirement. A corporation is an entity legally distinct from its officers or employees, which satisfies the "enterprise" definition of 18 U.S.C.A. § 1961(4).

*Id.* at 268. The court "conclude[d] that when officers and/or employees operate and manage a legitimate corporation, and use it to conduct, through interstate commerce, a pattern of racketeering activity those defendant persons are properly liable under § 1962(c)." *Id.* at 269.

Dow would have this court interpret the Third Circuit's holding in *Jaguar Cars* so as to encompass the proposition that a corporation may be liable for racketeering through an association-in-fact composed not only of the corporation itself but also its own employees, subsidiaries, and affiliates. The *Jaguar Cars* court did not address the situation where the "person" is a corporation, nor did it address its prior analysis in *Britting-*

ham. In *Brittingham,* plaintiff consumers sued Mobil Corporation and Mobile Chemical Company, alleging that defendants violated RICO in connection with the sale of biodegradable trash bags. *See Brittingham* 943 F.2d at 300. The "enterprise" alleged was the "association in fact of Mobil and Mobil Chemical, the advertising agencies engaged by them, ... and other agencies which participated in the marketing of Hefty 'Degradable' trash and garbage bags and Korditte and Marketote 'degradable' bags." *Id.* at 300. In affirming the district court's finding that the alleged enterprise was not distinct from the defendants, the Third Circuit noted that

a § 1962(c) enterprise must be more than an association of individuals or entities conducting the normal affairs of a defendant corporation. A corporation must always act through its employees and agents, and any corporate act will be accomplished through an "association" of these individual or entities.... Therefore, we must examine the enterprise allegation to determine whether it is no more than an association of individuals or entities acting on behalf of a defendant corporation.

*Id.* at 301.

Subsequent to its decision in *Jaguar Cars,* the Third Circuit affirmed a case holding that a corporation is not distinct from its subsidiaries, relatives, agents, and affiliates. *See Metcalf v. PaineWebber Inc.,* 886 F.Supp. 503, 513 (W.D.Pa.1995), *aff'd without op.,* 79 F.3d 1138 (3d Cir.1996) (table). Relying on the Third Circuit's decision in *Brittingham,* the district court in *Metcalf* stated that

[t]he sum and substance of [plaintiff's] allegations is that the [d]efendant either was the enterprise or acted as an association-in-fact enterprise along with its subsidiaries, relatives, agents and affiliates. Furthermore, the pleadings and briefs before the Court suggest that the enterprise was acting solely in furtherance of [d]efendant's own business interests. *Britting-*

enterprises.

(D.I.2, ¶ 226) According to Dow, these activities establish Exxon's association with the named

*ham* makes clear that these allegations are insufficient to state a violation of § 1962(c). *Id.* at 513 (footnotes omitted). The district court concluded that in order

> to satisfy the enterprise requirement, a complaint must include an allegation that the enterprise included some person or entity operating outside of the defendant's or defendants' normal scope of business. Here, all members of the alleged enterprise, from the brokers to the general partners of EP–I, were acting in furtherance of [d]efendant's business. Thus, these entities were not an "enterprise" within the meaning of § 1962(c).

*Id.* at 513–14. The *Metcalf* court determined that *Jaguar Cars* did not undermine or affect its analysis of the § 1962(c) claim in the action before it:

> *Jaguar Cars* made clear that "the essential holding of *Enright* remains undisturbed—a claim simply against one corporation as both 'person' and 'enterprise' is not sufficient" under § 1962(c). The *Jaguar Cars* court merely held that, "when officers and/or employees operate and manage a legitimate corporation, and use it to conduct ... a pattern of racketeering activity, those defendant persons are properly liable under § 1962(c)." Moreover, as the *Brittingham* court recognized, there is good reason to distinguish between corporate "persons" and individual "persons" in applying the *Enright* rule:
>
> > [I]ndividual defendants, in contrast to collective entities, are generally distinct from the enterprise through which they act. Unlike a collective entity, it is unlikely that an individual defendant by himself would constitute a valid enterprise.... But when a defendant is itself a collective entity, it is more likely that the alleged enterprise is in reality no

different from the association of individuals or entities that constitute the defendant or carry out its actions. Unlike individual defendants, a corporation can act only through its employees and agents.

*Id.* at 514 n. 12 (citations omitted). Thus, the *Metcalf* court read *Jaguar Cars* as not altering *Brittingham's* analysis of corporate "persons" and "enterprises."

■■■ Given the Third Circuit's affirmance of *Metcalf,* this court is unwilling to give *Jaguar Cars* the expansive reading Dow requests.[41] Accordingly, the court finds that the Exxpol Enterprise does not satisfy the distinctiveness requirement.

With respect to the Extended Exxpol Enterprise, Dow contends "that Exxon's licensees and customers are independent parties that provide more than sufficient distinctiveness to the enterprise even under the pre-*Jaguar Cars* rule." (D.I.47 at 36) Dow avers that the independent customers and licensees actively participated in the enterprise "by purchasing polyethylenes and taking technology licenses from [d]efendants in order to advance their particular monetary interests apart from [d]efendants." (D.I.2, ¶ 226) According to Dow, the key is the patents, which permit "the defendants to dictate and control the activities of customers and licensees 'by virtue of the restrictions they impose by law and by license on anyone in the enterprise who exploits the fraudulently obtained and asserted patent property rights.'" (D.I.47 at 36 (quoting D.I.2, ¶ 226))

■■■ Although Dow alleges that Exxon's customers and technology licensees are "associated-in-fact" with the other components of the Extended Exxpol enterprise, Dow has failed to provide support for this allegation. An association is "a group of

**41.** The court recognizes that other courts within the circuit have interpreted *Jaguar Cars* in a different manner. Some have allowed an association-in-fact enterprise consisting solely of the named defendant "persons." *See, e.g., Brokerage Concepts, Inc. v. U.S. Healthcare, Inc.,* No. Civ.A. 95–1698, 1995 WL 455969, at *6–7 (E.D.Pa. July 27, 1995); *Brook–Med Imaging, P.A. v. Imaging Management Assocs.,* Civ. No. 94–3442(WHW), 1995 WL 34864, at *5–7 (D.N.J. Jan. 27, 1995). Another court allowed no overlap between the

defendant persons and the association-in-fact enterprise. *See Klein v. Boyd,* No. Civ.A. 95–5410, 1996 WL 230012, at *11 (E.D.Pa. May 3, 1996). Other courts have allowed some, but not complete, overlap between the entities comprising the association-in-fact enterprise and the defendant persons. *See, e.g., Kaiser v. Stewart,* No. Civ.A. 96–6643, 1997 WL 476455, at *8–9 (E.D.Pa. Aug.19, 1997); *Schuylkill Skyport Inn, Inc. v. Rich,* No. Civ.A. 95–3128, 1996 WL 502280, at *31–32 (E.D.Pa. Aug.21, 1996).

persons associated together for a common purpose of engaging in a course of conduct ... [and] is proved by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *Turkette*, 452 U.S. at 583, 101 S.Ct. 2524. The facts alleged do not indicate that the customers and/or licensees were associated with a common objective or purpose or that they functioned as a continuing unit with the other components of the alleged enterprise. Dow points to the patent licensing agreements in order to establish a relationship between the customers/licensees and the defendant persons. However, there is no indication that these licenses resulted from any type of agreement between the defendants and the customers/licensees other than a normal marketing network. The customers/licensees were not required to purchase/license Exxon's patented technology, rather they were free to negotiate with whomever they chose. Merely licensing or purchasing Exxon's patented technology without more is insufficient to establish an association-in-fact enterprise. *See Arthur v. Guerdon Indus.*, 827 F.Supp. 273, 280 (D.Del. 1993). Thus, Dow's Extended Exxpol enterprise also fails to satisfy the distinctiveness requirement. Accordingly, Dow has failed to state a claim under § 1962(c).

### d. Section 1962(d) Claim

Section 1962(d) provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) or this section." Since § 1962(d) prohibits conspiring to violate § 1962(a), (b), and (c) the viability of Dow's § 1962(d) claim depends on the legal sufficiency of its § 1962(a), (b), and (c) claims. *See Jaguar Cars*, 46 F.3d at 262. The court already has determined that Dow's § 1962(a), (b), and (c) claims are legally insufficient. Accordingly, Dow's claim for conspiracy under § 1962(d) is dismissed.[42] *See Lightning Lube*, 4 F.3d at 1191.

---

42. Since Dow's federal claims will be dismissed pursuant to Fed.R.Civ.P. 12(b)(6) for failure to state a claim, the court need not address Exxon's

## V. CONCLUSION

For the reasons stated above, the court finds that it has subject matter jurisdiction over Dow's RICO claims. The court further finds that Dow's complaint fails to state a cause of action against defendants Exxon and ECPI under RICO. Therefore, defendants' motion to dismiss the complaint with respect to these claims shall be granted.

The remainder of plaintiff's claims are grounded on state law. Since plaintiff's § 1981 claim was the only claim raised in the amended complaint over which the court had original jurisdiction, and since the court "may decline to exercise supplemental jurisdiction" over state law claims if the court "has dismissed all claims over which it has original jurisdiction," the remaining state law claims are properly dismissed on jurisdictional grounds. 28 U.S.C. § 1367(c)(3). An appropriate order shall issue.

request that the action be stayed pending conclusion of proceedings before the PTO or on appeal.